**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JULIETTA MOLNAR,          )
                                )
              Plaintiff,     )       Civil Action No. 11-127 Erie
                                )
     v.                   )
                                )
MICHAEL J. ASTRUE,      )
Commissioner of Social Security,  )
                                )
          Defendant.    )

## <u>MEMORANDUM OPINION</u>

McLAUGHLIN, SEAN J., District Judge.

## I.    INTRODUCTION

Julietta Molnar, ("Plaintiff"), commenced the instant action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), denying her claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401, *et seq.* and § 1381 *et seq.*  Plaintiff filed her applications on August 5, 2008 alleging disability since May 31, 2007 due to severe asthma, esophagitis and fibromyalgia (AR 182-188; 214).[1]  Her applications were denied (AR 97-104), and following a hearing held on December 11, 2009 (AR 33-78), the administrative law judge ("ALJ") issued her decision denying benefits to Plaintiff on April 13, 2010 (AR 10-22).

Plaintiff's request for review by the Appeals Council was subsequently denied (AR 1-6), rendering the Commissioner's decision final under 42 U.S.C. § 405(g).  The instant action challenges the ALJ's decision.  Presently pending before the Court are the parties' cross-motions for summary judgment.  For the reasons that follow, both motions will be denied and the matter will be remanded to the Commissioner for further proceedings.

---

[1] References to the administrative record [ECF No. 10], will be designated by the citation "(AR ___)".

## II.     BACKGROUND

Plaintiff was 38 years old on the date of the ALJ's decision (AR 32; 182).  She has a high school education, completed two years of college, and has past work experience as an administrative assistant and loan officer (AR 215; 221).

Plaintiff has been treated by Andrew DeMarco, M.D., her primary care physician, since 2001 (AR 590-591).  In 2001, Plaintiff complained of a persistent cough, fatigue and muscle weakness (AR 590-591).  In 2002, Plaintiff was treated for her complaints of anxiety and shortness of breath on exertion (AR 585-587).  In September 2002, Plaintiff reported intense muscle pain with activity, but her physical examination was unremarkable (AR 583).  Dr. DeMarco assessed her with probable fibromyalgia related to her depression (AR 583).  In 2003, Plaintiff was treated for gastroesophageal reflux disease ("GERD"), persistent coughing and migraine headaches (AR 576-580).  In October 2003, Plaintiff complained of headaches occurring every two to three months (AR 576).  She received injection therapy and her symptoms resolved (AR 576).

In 2004, Plaintiff was treated for GERD, anxiety, fatigue and generalized weakness (AR 570-573).  In June 2005, Dr. DeMarco reported that Plaintiff was "doing fairly well" (AR 567).  Plaintiff denied experiencing any weakness, and her physical examination was unremarkable (AR 567-568).  In December 2005 Plaintiff was treated for complaints of depression and anxiety following a difficult break-up with her boyfriend (AR 560-563).  On March 28, 2006, Plaintiff complained of left thigh pain and shortness of breath on exertion (AR 315).  Her physical examination was unremarkable except for some tenderness of her thigh on palpation (AR 315).  On March 30, 2006, Dr. DeMarco reported that Plaintiff's shortness of breath had responded "nicely" with Albuterol (AR 314).

On January 2, 2007, Plaintiff complained that she experienced headaches once per month (AR 310).  She reported that her asthma had improved with medication, and that her depression and anxiety were "gone" (AR 310).  Dr. DeMarco reported that Plaintiff was "actually doing fairly well and seem[ed] to be happy with her new position in life" (AR 310).  Her physical examination was unremarkable, and she was prescribed medications for her

headaches, asthma and GERD (AR 312).  Dr. DeMarco diagnosed her with headaches; history of a pulmonary fungal infection; reactive airway disease; GERD; paresis in the upper extremity muscles; and anxiety and depression, well controlled (AR 312).

An MRI of Plaintiff's cervical spine dated January 5, 2007 revealed only minimal disc bulges in the mid cervical spine area, with no evidence of cervical nerve root or spinal cord compromise (AR 326).  When seen by Dr. DeMarco on January 8, 2007, Plaintiff complained of diffuse muscle pain but denied any weakness or numbness (AR 308).  She was assessed with fibromyalgia and prescribed Cymbalta (AR 308).

On January 30, 2007, Plaintiff was seen by Cheryl Bernstein, M.D., for complaints of generalized body pain (AR 300-301).  Physical examination revealed findings "significant for tender points consistent with fibromyalgia" (AR 301).  Dr. Bernstein diagnosed Plaintiff with fibromyalgia and recommended physical therapy, a trial of antidepressants, and an analgesic (AR 301).

Plaintiff returned to Dr. DeMarco on July 20, 2007 and reported that her fibromyalgia and depression had flared up (AR 303).  He found she was in no acute distress and her physical examination was unremarkable (AR 303).  Dr. DeMarco increased her GERD medication but found no specific treatment was indicated for her fibromyalgia or depression (AR 303).

Plaintiff was seen by Wesley Hilbert, M.D. on November 5, 2007 and complained of migraine headaches, asthma, GERD, fibromyalgia and intermittent left groin pain (AR 379).  Her physical examination was normal, and she was assessed with, *inter alia*, acute cystitis and a urinary tract infection (AR 381).  Plaintiff returned for follow-up on November 19, 2007, and Dr. Hilbert reported that Plaintiff's lungs were clear with "good" equal breath sounds (AR 376).  She also had a full range of motion and no crepitus of the cervical spine (AR 376).

A pulmonary function test dated December 6, 2007 revealed normal lung volumes and flow rates with no evidence of obstructive or restrictive defects (AR 382).  On December 19, 2007, Plaintiff reported to Dr. Hilbert that her headaches were less frequent with medication changes (AR 372).  Her physical examination remained unchanged (AR 373).

3

On January 3, 2008, Plaintiff underwent a consultative examination performed by Leo Swantek, D.O. (AR 331-349).  Plaintiff reported multiple impairments, including severe asthma, GERD, fibromyaligia and migraine headaches (AR 331-333).  Dr. Swantek reported that her ear, nose and throat examination was essentially normal, although she experienced coughing and shortness of breath while talking (AR 335).  He further reported that she had a good range of motion in her upper and lower extremities, and her straight leg raising test was negative (AR 336).  Dr. Swantek opined that Plaintiff could lift and carry two to three pounds frequently and ten pounds occasionally; stand and walk for four hours a day; sit for eight hours a day with a sit/stand option; and occasionally engage in postural activities (AR 335-336).  He also concluded that Plaintiff should avoid exposure to vibrations, extreme temperatures, wetness, humidity, fumes, odors, chemicals and poor ventilation (AR 336).

On February 14, 2008, Nghia Van Tran, M.D., a state agency reviewing physician, reviewed the medical evidence of record and concluded that Plaintiff could perform sedentary work, but could only occasionally climb, balance, stoop, kneel, crouch and crawl (AR 286-287).  He further found that Plaintiff should avoid even moderate exposure to extreme temperatures, wetness, humidity, fumes, odors, gases and poor ventilation (AR 288).  Dr. Tran concluded that Plaintiff's claimed restrictions were only partially credible in light of the medical evidence of record (AR 291).  Dr. Tran found that his assessment partially reflected Dr. Swantek's opinion (AR 291).

Plaintiff was seen by Dr. Swantek on March 20, 2008 and complained that it was painful for her to move her hands overhead (AR 683).  Her physical examination was unremarkable except for some mild epigastric tenderness (AR 683).  Dr. Swantek diagnosed Plaintiff with, inter alia, chronic bronchial asthma and chronic cough, and prescribed medication (AR 683).  On April 10, 2008, Dr. Swantek noted that Plaintiff's bronchial asthma was not severe based on her diagnostic studies, and she had decreased her medications without any negative impact (AR 682).  On April 21, 2008, Dr. Swantek reported that Plantiff's lungs were clear on physical examination (AR 681).

4

On May 30, 2008, Plaintiff returned to Dr. Hilbert and complained of fatigue and achiness (AR 362). On physical examination, her lungs were clear and her respiration rhythm and depth were normal (AR 363). Dr. Hilbert found trigger points on Plaintiff's posterior neck and leg (AR 363). On July 23, 2008, Plaintiff reported she was doing well on her fibromyalgia medication (AR 360).

Plaintiff was evaluated by Joseph Rowaine, D.O., a pulmonologist, on July 28, 2008 (AR 350-355). Her physical examination revealed clear breath sounds and a pulmonary function test revealed no restrictive defect or obstructive disease (AR 352-353). A six-minute walk test was "completely normal" (AR 352-353). Dr. Rowaine recommended a cardiopulmonary exercise stress test (AR 352).

Plaintiff returned to Dr. Hilbert on July 30, 2008 and complained of left hip pain (AR 358). Physical examination was essentially normal except for a minimal positive straight leg raising on the left (AR 359). She was assessed with acute left sciatica (AR 359).

On July 31, 2008, Plaintiff was seen by Thaddeus Osial, Jr., M.D., a rheumatologist, for evaluation of her fibromyalgia (AR 357). Plaintiff complained of pain "everywhere" and claimed that daily activities were too painful to perform (AR 357). She stated that Ultram had helped her symptoms but she had stopped taking it due to pregnancy (AR 357). Dr. Osial reported that her physical examination was notable "only for diffuse tender points" (AR 357). There was no significant peripheral arthritis and no significant medical findings (AR 357). Dr. Osial found Plaintiff's history and physical were consistent with a diagnosis of chronic fibromyalgia, and he recommended she restart her medication following her pregnancy (AR 357).

Plaintiff began treatment with Gregory Zinni, M.D., on October 28, 2008 and complained of shortness of breath on minimal exertion (AR 420). Plaintiff's lungs were clear on physical examination, and she was diagnosed with asthma, fibromyalgia and GERD (AR 420). On December 8, 2008, Plaintiff reported that Albuterol helped alleviate her asthma symptoms (AR 420). Dr. Zinni reported that Plaintiff's lungs were clear on examination, and a pulmonary

5

function test was normal (AR 420).  She was diagnosed with asthma and referred to a pulmonologist (AR 420).

Plaintiff was evaluated by Digvijay Singh, M.D., a pulmonologist, on December 11, 2008 (AR 423-427).  Plaintiff complained of shortness of breath and "coughing fits" (AR 423).  She had no musculoskeletal complaints and denied any symptoms of anxiety or depression (AR 424).  On physical examination, Plaintiff's lungs were clear with no wheezes, rhonchi or crackles found, but frequent coughing was noted (AR 425).  Plaintiff's musculoskeletal examination revealed no joint tenderness or stiffness, she had good muscle strength and tone, and her gait was normal (AR 425).  Dr. Singh diagnosed her with a history of asthma, fibromyalgia, GERD, pulmonary candida infection and pulmonary fibrosis (AR 425).  She was prescribed medication and advised to avoid extremely dry and cold temperatures (AR 426).

On January 26, 2009, Kathryn Drew, M.D., a state agency reviewing physician, reviewed the medical evidence of record and concluded that Plaintiff could perform medium work, but should avoid even moderate exposure to fumes, odors, gases and poor ventilation (AR 277-281).  Dr. Drew noted that Plaintiff claimed she used a wheelchair, but the medical evidence did not support the need for an ambulatory aid of any type (AR 282).  She further noted that Plaintiff's medications had been relatively effective in controlling her symptoms (AR 284).  Dr. Drew concluded that Plaintiff's allegations relative to her functional restrictions were inconsistent with the objective findings and the medical evidence of record (AR 282).

Plaintiff was seen by Teresa Mellington, R.N. at Dr. Singh's office on February 24, 2009 and complained of shortness of breath, a racing heart, and dementia type symptoms (AR 620).  She claimed she became confused and disoriented while driving, and had three auto accidents (AR 620).  On physical examination, Ms. Mellington reported that Plaintiff was fully oriented and her lungs were completely clear with no wheezes, rhonchi or crackles noted (AR 621).  Her musculoskeletal examination revealed no joint tenderness or stiffness, she had good muscle strength and tone, and her gait was normal (AR 621).  She was diagnosed with history of asthma, a history of fibromyalgia, GERD, pulmonary candida infection in 2000, and a history of

pulmonary fibrosis (AR 621).  Ms. Mellington advised her not to drive given her reported history of auto accidents (AR 621).

Plaintiff returned to Dr. Singh on March 6, 2009 and her physical examination remained unchanged (AR 421-422).  Dr. Singh reported that her pulmonary function studies were "completely normal" and her laboratory studies were also normal (AR 421).  She was diagnosed with bronchial asthma and prescribed medications (AR 421-422).

On April 8, 2009, Plaintiff was seen by Ralph Rothenberg, M.D., a rheumatologist for complaints of headaches and poor sleep patterns (AR 430-432).  She further reported that "everything" hurt and she had trouble lifting her arms above her shoulders (AR 430).  Her physical examination was normal, and Dr. Rothenberg noted that other than minor lower back tenderness, no fibromyalgia tender points were identified (AR 432).  He diagnosed Plaintiff with myofascial pain syndrome, and considered somatic conversion syndrome[2] as a possible diagnosis (AR 432).  He recommended laboratory testing and if "nothing show[ed]" that Plaintiff be referred for a psychiatric evaluation (AR 432).

Plaintiff returned to Dr. Zinni on July 7, 2009 and complained of left rib cage discomfort and some "unsteadiness" on her feet (AR 610).  Physical examination revealed that her lungs were clear and her strength testing was within normal limits (AR 610).  Dr. Zinni noted that her left lower ribs were tender on palpation (AR 610).  He assessed Plaintiff with fibromyalgia, intercostal muscle strain and asthma, and prescribed medications (AR 610).

Pulmonary function testing dated August 3, 2009 showed possible early obstructive pulmonary impairment (AR 688).  It was noted that Plaintiff would benefit from bronchodilator therapy (AR 688).

Dr. Zinni completed three forms on October 22, 2009 (AR 705-706; 709-710; 713).  On a medical statement form with respect to Plaintiff's depression, Dr. Zinni opined that since July 1, 2008, Plaintiff was markedly limited or extremely limited in most mental work related areas (AR 706).  On a fibromyalgia residual functional capacity questionnaire, Dr. Zinni stated that Plaintiff

---

[2] "Somatization" is the "conversion of mental experiences or states into bodily symptoms." *Dorland's Illustrated Medical Dictionary* 1759 (31st ed. 2007).

had the following symptoms: multiple tender points, breathlessness, widespread pain, an inability to walk effectively, chronic fatigue and morning stiffness (AR 709). He opined that she was precluded from working (AR 709). On an asthma residual functional capacity questionnaire, Dr. Zinni reported that Plaintiff suffered from asthma attacks occurring at least every two months (AR 713). He opined that Plaintiff suffered from mild, persistent asthma and was unable to work (AR 713).

Dr. Zinni also wrote a letter dated October 28, 2009, stating that Plaintiff was disabled due to constant headaches, sleep disturbance, muscle weakness, anxiety, depression, memory loss, and speech disturbance (AR 716).

On October 29, 2009, Dr. DeMarco also completed four forms with respect to Plaintiff's impairments (AR 691-692; 695; 698; 701-702). On a fibromyalgia residual functional capacity questionnaire, Dr. DeMarco reported that Plaintiff had, *inter alia*, multiple tender points since April 1, 2001 and was only able to work one hour per day (AR 691-692). On an asthma residual functional capacity assessment questionnaire, Dr. DeMarco reported that Plaintiff suffered from asthma attacks occurring at least every two months (AR 695). He opined that she could only work one hour per day due to moderate, persistent asthma (AR 695). On a pain questionnaire, Dr. DeMarco stated that Plaintiff suffered from fibromyalgia and severe muscle weakness that was "debilitating" (AR 698). Dr. DeMarco further stated that Plaintiff's subjective complaints were "not psychological" in nature (AR 698). With respect to Plaintiff's depression, Dr. DeMarco indicated that, since April 1, 2001, Plaintiff was markedly limited in her ability to remember work-like procedures; carry out detailed instructions; and maintain attention and concentration (AR 702). He also found she was extremely limited in her ability to understand and remember detailed instructions; complete a normal workday; perform at a consistent pace; and interact appropriately with the public (AR 702).

Plaintiff and Frances Kinley, a vocational expert, testified at the hearing held by the ALJ on December 11, 2009 (AR 33-78). Plaintiff testified that she lived with her husband and five children (AR 42). She acknowledged working after her alleged disability onset date, but claimed she stopped working in the fourth quarter of 2008 due to an inability to concentrate (AR 38-41).

8

Plaintiff testified that she was able to fold some laundry, and her children helped with the cooking (AR 43-44). Plaintiff further testified she was able to care for her two-year-old daughter (AR 43-44). Plaintiff indicated she was able to care for her personal needs, but at times needed help from her husband (AR 52-53). Plaintiff claimed she used a wheelchair for mobility, but was able to drive and pick up her children at school as needed (AR 44-46). Plaintiff testified she no longer engaged in any hobbies (AR 43). She stated she could sit for fifteen to twenty minutes, lift five pounds and stand for one to two minutes (AR 48).

Plaintiff further testified that her asthma caused shortness of breath with any activity (AR 53-54). She indicated that her food intake was limited by her GERD symptoms (AR 54-55). Plaintiff testified she also suffered from anxiety and depression, but received no mental health treatment because she could not afford the $20.00 charge per visit (AR 55). She claimed to have debilitating migraine headaches every two to three weeks lasting for two or three days (AR 56). She also experienced constant pain due to her fibromyalgia (AR 57-58). Her medications consisted of Ultram for pain, an inhaler for asthma, Prevacid for GERD, Maxalt for migraines, and an occasional Xanax for anxiety (AR 51-52).

The ALJ asked the vocational expert to assume an individual of the same age, education and work experience as the Plaintiff, who was capable of lifting and carrying two to three pounds frequently and up to ten pounds occasionally, and who could engage in occasional postural maneuvers such as balancing, stooping, kneeling, crouching, crawling and climbing, and needed a sit/stand option (AR 73). Such an individual was further limited to occupations that required no more than occasional pushing and pulling with the upper and lower extremities, which included the operation of hand levers and foot pedals, and could walk a maximum of four hours per day (AR 73). The ALJ also posited that it would be necessary for the individual to work in close proximity to a restroom, and must avoid exposure to environmental irritants and temperature extremes (AR 73). The vocational expert testified that such an individual could perform their past positions as an administrative assistant and loan officer (AR 72). The vocational expert further testified that such individual could perform the jobs of a charge account clerk, telephone quote clerk, surveillance system monitor and ticket taker (AR 74-75).

Plaintiff also submitted Questionnaires completed in October 2009 by her husband, Mark Molnar, and her friend, Cindy Monaco with respect to her impairments (AR 251-262).  Mr. Molnar and Ms. Monaco reported the Plaintiff was significantly limited due to pain, breathing problems and mental problems (AR 251-262).

Following the administrative hearing,[3] Dr. DeMarco authored a letter dated December 14, 2009, stating that Plaintiff had symptoms of both fibromyalgia and chronic fatigue syndrome (AR 722).  He noted that Plaintiff had consistently complained over the years of severe muscle pain, severe fatigue, sleep problems, anxiety and depression, and migraines (AR 722).  He reported that Plaintiff had 16 out of 18 trigger points on physical examination (AR 722).  He stated that completing activities of daily living were "nearly impossible" for Plaintiff (AR 722). In addition, he noted that Plaintiff's "profound" asthma contributed to her disability (AR 722). Finally, Dr. DeMarco reported that Plaintiff suffered from migraine headaches and had seen a specialist for treatment (AR 723).  Dr. DeMarco also prescribed a power wheelchair for the Plaintiff (AR 720-721).

On February 9, 2010, Michael Magoline, M.D., an orthopedic surgeon, performed a consultative examination on the Plaintiff (AR 735-737).  Plaintiff complained of severe fatigue, sleep problems, anxiety, depression, migraine headaches and pulmonary problems (AR 735). She claimed she had difficulty performing daily activities (AR 735).  On physical examination, Plaintiff was in no acute distress and walked with a normal gait (AR 735).  Plaintiff had full ranges of motion, 5/5 muscle strength and 2/4 deep tendon reflexes (AR 735-736).  Dr. Magoline noted that she complained of soft tissue pain with palpation of any area of her body (AR 736). Dr. Magoline concluded that her orthopedic examination was normal except for her complaints of soft tissue pain, and no gross abnormalities were found (AR 736).  He recommended that she be evaluated by a neurologist and psychiatrist (AR 736).

Dr. Magoline opined that Plaintiff could lift up to ten pounds frequently and twenty pounds occasionally; carry up to twenty pounds occasionally; sit five hours; stand two hours; and

---

[3] The ALJ requested Plaintiff provide additional information from her treating physicians and held the record open for twenty days in order for her to do so (AR 76-77).  The ALJ further referred the Plaintiff for a consultative examination (AR 77).

walk one hour in an 8-hour workday (AR 729-730).  He found she did not require the use of a cane to walk (AR 730).  He further found that Plaintiff could occasionally perform manipulative activities with her hands; operate foot controls; and climb ramps and stairs (AR 731-732). Finally, he concluded that she could never balance, stoop, kneel, crouch or crawl, and never be exposed to environmental irritants, except she could operate a car and be around moderate vibrations (AR 732-733).

On April 13, 2010, the ALJ issued his decision denying benefits to the Plaintiff (AR 10-22) and her request for review by the Appeals Council was denied (AR 1-6), rendering the Commissioner's decision final under 42 U.S.C. § 405(g).  She subsequently filed this action.

### III.    STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence.  *See* 42 U.S.C. § 405(g).  Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 1097, 229 (1938)); *see also Richardson v. Parales*, 402 U.S. 389, 401 (1971); *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995).  It has been defined as less than a preponderance of evidence but more than a mere scintilla.  *See Richardson*, 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995).  Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive.  42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390.  A district court cannot conduct a *de novo* review of the Commissioner's decision or re-weigh evidence of record.  *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D.Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion … so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings.").  To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole.  *See* 5 U.S.C. § 706.

# IV.   DISCUSSION

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity.  42 U.S.C. § 423(d)(1)(A).  Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly disabled and whose income and resources fall below designated levels.  42 U.S.C. § 1382(a).  A person who does not have insured status under Title II may nevertheless receive benefits under Title XVI.  *Compare* 42 U.S.C. § 423(a)(1) with 42 U.S.C. § 1382(a).  In order to be entitled to DIB under Title II, a claimant must additionally establish that his disability existed before the expiration of his insured status. 42 U.S.C. § 423(a), (c).  The ALJ found that the Plaintiff met the disability insured status requirements of the Act through December 31, 2012 (AR 10).  SSI does not have an insured status requirement.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The Commissioner uses a five-step evaluation process to determine when an individual meets this definition.  *See* 20 C.F.R. §§ 404.1520; 416.920.  The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003).  If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able

to perform substantial gainful activity in jobs available in the national economy.  *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

Here, the ALJ concluded that Plaintiff had the following severe impairments: asthma, GERD, and fibromyalgia, but determined at step three that she did not meet a listing (AR 12-14). The ALJ described the Plaintiff's residual functional capacity as follows:

> …[T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she would be limited to lifting/carrying 3 pounds frequently and 10 pounds occasionally, with no more than occasional postural maneuvers, such as balancing, stooping, kneeling, crouching, crawling and climbing.  She must have a sit/stand option.  She would be limited to occupations that require no more than occasional pushing/pulling with the upper and lower extremities to include the operation of hand levers and foot pedals.  She must avoid exposure to [fumes], odors, dusts, gases, chemical irritants, poor ventilation, temperature extremes, vibration, extreme dampness and humidity.  She could walk a maximum of 4 hours a day and would require close proximity to restroom facilities.

(AR 15).  At the final step, the ALJ concluded that Plaintiff could perform the jobs cited by the vocational expert at the administrative hearing (AR 21-22).  The ALJ also determined that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not fully credible, and that the statements of Mr. Molnar and Ms. Monaco were only partially credible (AR 16; 21).  Again, we must affirm this determination unless it is not supported by substantial evidence.  *See* 42 U.S.C. § 405(g).

Plaintiff first argues that the ALJ erred as a matter of law in concluding that her mental impairments were not severe at step two of the evaluation process.  *See* [ECF No. 18] pp. 13-16. Step two of the process "determines whether the claimant has a medically severe impairment or combination of impairments."  *Bowen v. Yuckert*, 482 U.S. 137, 140-41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).  According to the Commissioner's regulations, "an impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1521(a); 416.921(a); *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004).  Basic work activities are defined as "abilities and aptitudes necessary to do most jobs," including, *inter alia*,

13

understanding, carrying out, and remembering simple job instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 1521(b)(3)-(6); 416.921(b)(3)-(6). "The step-two inquiry is a *de minimis* screening device to dispose of groundless claims." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003). To show that an impairment is severe, however, a claimant must demonstrate "something beyond a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." *McCrea*, 370 F.3d at 360 (quotation and citations omitted). The burden of showing that an impairment is severe rests with the claimant. *Bowen*, 482 U.S. 146 n.5.

In evaluating whether a mental impairment is severe, the ALJ must evaluate the degree of functional loss it causes by rating a claimant's level of functional limitation in four areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation. 20 C.F.R. §§ 404.1520a(b); 416.902a(b). If a claimant's limitations are rated as "none" or "mild" in the first three areas and "none" in the fourth area, the mental impairment will generally be found not severe. 20 C.F.R. §§ 404.1520a(d)(1); 416.920a(d)(1).

The ALJ concluded that Plaintiff's anxiety disorder was not severe because it did not cause more than a minimal limitation in her ability to perform basic mental work activities (AR 13). In making this finding, the ALJ found that Plaintiff had no difficulties with respect to her daily activities (AR 13). The ALJ reasoned that despite her reports of limited activities, she was able to complete some household chores, care for her two-year-old daughter, and was independent in her personal care (AR 13). The ALJ further found that Plaintiff had no difficulties in social functioning, noting that while Plaintiff claimed she rarely left her home by herself, she lived with her husband and five children (AR 13). The ALJ also found Plaintiff had no limitations in the areas of concentration, persistence and pace, relying on her ability to care for her two-year-old daughter (AR 13). Finally, the ALJ found no evidence of episodes of decompensation (AR 13). She observed that Plaintiff had not been hospitalized or sought

emergency treatment; had no suicidal thoughts or psychosis associated with decompensation; and had not seen a therapist or counselor (AR 13).

In challenging the ALJ's step two conclusion that her mental impairments were not severe, Plaintiff argues in her Brief:

> When assessing the severity of Molnar's anxiety, the ALJ held it to be a non-severe impairment after evaluating it under the four broad areas of psychological functioning (TR 13).  The ALJ found that because Molnar "completes some household chores, takes care of her 2-year-old daughter and is independent in personal care," there is consequently "no impairment in activities of daily living" (TR 13).  The ALJ further found that "there is no impact on social functioning," evidenced by the fact that Molnar "lives with her husband and 5 children," despite the fact that "she rarely leaves the house by herself."  (TR 13).  Regarding Molnar's abilities to maintain concentration, persistence, and pace, the ALJ found that, "The claimant states that she gets easily lost. However, the claimant takes care of her 2-year-old daughter.  Therefore, there is no impairment in concentration, persistence of pace" (TR 13).
>
> The ALJ's conclusion that there is "no" limitation in any of the four areas of functioning affected by mental impairments does not find support in the substantial evidence, even that which the ALJ acknowledges and cites herself.  The ALJ's statements admit by their very language the Molnar's functioning is *limited* in these areas.  Her arguments in support of finding "no" limitation in these areas actually support the opposite conclusion.  For example, [the] fact that Molnar is limited to doing "some" chores implies she cannot do many other chores (as she testified) and contradicts the ALJ's finding of "no impairment in activities of daily living."  Similarly, the ALJ's conclusion that the fact that Molnar lives with her husband and five children is evidence that she has no deficiency in social functioning, even though Molnar rarely leaves the house, is almost nonsensical.  Living with and interacting with one's immediate family, who is extremely familiar (and cannot be avoided), is surely not the area of "social functioning" that the regulations require an adjudicator to assess.  Additionally, it is not clear how Molnar's ability to take care of her young daughter, in the extremely limited way and with the great assistance she has, as she testified to at the hearing, shows an inability to sustain concentration, persistence, and pace.  More telling is the "dementia type symptoms," which lead her, when attempting to leave the house, "to call her husband for instructions on where she was going and how does she get there" (TR 620). … Essentially, the ALJ's analysis of Molnar's psychological impairments consists of *non-sequiturs* that cannot satisfy the ALJ's step-two requirement to provide "a careful evaluation of the medical findings which describe the impairment(s) and an informed judgment about its … limiting effects on the individual's … mental

ability[] to perform basis work activities … " [a]s required by Social Security
Ruling 85-28.

[ECF No. 18] pp. 14-16 (footnote omitted).

We find ourselves in agreement with the central thesis of Plaintiff's argument, namely, that the ALJ's reliance on the previously described daily activities of the Plaintiff are not necessarily inconsistent with a finding at step two that her mental impairments were severe.

We also observe that Plaintiff presented the opinions of treating physicians Dr. Zinni and Dr. DeMarco, the only physicians that offered opinions with respect to Plaintiff's functional limitations resulting from her mental impairments.  Dr. Zinni reported that Plaintiff suffered from anxiety, depression, and memory loss (AR 716).  He opined that Plaintiff was markedly limited in her ability to remember locations and work-like procedures; understand, remember, and carry out short and simple instructions; sustain an ordinary routine without special supervision; respond appropriately to criticism from supervisors and changes in the work setting; and take appropriate precautions with respect to normal hazards (AR 706).  Dr. Zinni further found that Plaintiff was extremely limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; and work in proximity to others without being distracted (AR 706).  He also found that Plaintiff was extremely limited in her ability to perform at a consistent pace without an unreasonable number and length of rest periods (AR 706).

Dr. DeMarco reported that Plaintiff consistently complained of feelings of anxiety and depression (AR 722).  He similarly opined that Plaintiff was markedly limited in her ability to remember work-like procedures; carry out detailed instructions; and maintain attention and concentration (AR 702).  He also found she was extremely limited in her ability to understand and remember detailed instructions; complete a normal workday; perform at a consistent pace; and interact appropriately with the public (AR 702).

Given the "*de minimis*" standard with respect to satisfying the step two severity finding, coupled with the conclusions of Drs. Zinni and DeMarco, we conclude, contrary to the ALJ, that

substantial evidence supports a finding that Plaintiff's mental impairments were severe within the meaning of step two.

We realize that an error at step two may be harmless if the ALJ considers the effects of the impairment in assessing a claimant's residual functional capacity ("RFC").[4]  *See McCartney v. Comm'r of Soc. Sec.*, 2009 WL 1323578 at *16 (W.D.Pa. 2009) (error harmless where ALJ considered all of claimant's impairments in determining his residual functional capacity); *Lee v. Astrue*, 2007 WL 1151281 at *3 n.5 (E.D.Pa. 2007) (noting that ALJ's step two determination would not warrant remand where the ALJ proceeded with the five step sequential evaluation process and analyzed the claimant's limitations, considering both severe and non-severe).  However, in the present case the error cannot be considered harmless, because the ALJ did not consider, given her finding at step two, whether any restrictions were appropriate in formulating her RFC at step four.  Therefore a remand for further proceedings is required in order for the ALJ to consider this issue.

Although the case is being remanded for a proper analysis of the Plaintiff's mental impairments, we shall also address Plaintiff's challenges to the ALJ's evaluation of the opinions of Dr. DeMarco and Dr. Zinni with respect to her physical impairments.  The Third Circuit has repeatedly held that "[a] cardinal principle guiding disability determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a long period of time.'"  *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)) (citations omitted); *see also Adorno v. Shalala*, 40 F.3d 43, 47 (3d Cir. 1994).  As such, "a court considering a claim for disability benefits must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all."  *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993).  A treating source's opinion concerning the nature and severity of the claimant's alleged

---

[4] "'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'"  *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3rd Cir. 2000) (quoting *Hartranft*, 181 F.3d at 359 n.1; *see also* 20 C.F.R. § 404.1545(a).  An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner.  20 C.F.R. § 404.1527(e)(2).  In making this determination, the ALJ must consider all the evidence before him.  *Burnett*, 220 F.3d at 121.

impairments will be given controlling weight if the Commissioner finds that the treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001); 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2).

In choosing to reject a treating physician's opinion, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his own credibility judgments, speculation or lay opinion. *Plummer*, 186 F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988) (holding that "the medical judgment of a treating physician can be rejected only on the basis of contradictory medical evidence" not "simply by having the administrative law judge make a different judgment"); *Moffat v. Astrue*, 2010 WL 3896444 at *6 (W.D.Pa. 2010) ("It is axiomatic that the Commissioner cannot reject the opinion of a treating physician without specifically referring to contradictory medical evidence."). Finally, where an ALJ chooses to reject the opinion of a treating physician, he must adequately explain in the record his reason for doing so. *See Sykes v. Apfel*, 228 F.3d 259, 266 (3d Cir. 2000) ("Where the Secretary is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence."); *Cotter v. Harris*, 642 F.2d 700, 705-07 (3d Cir. 1981) (without an adequate explanation, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored."). In rejecting the opinions of Dr. Zinni and Dr. DeMarco, the ALJ stated:

> In this case, Dr. Zinni and Dr. DeMarco are treating physicians and their opinions would ordinarily be entitled to great weight. However, their opinions are not consistent with their own relatively normal examinations and conservative treatment of the claimant. They are also not supported by the claimant's medical record. For example, both Dr. Zinni and Dr. DeMarco found that the claimant's asthma meets the listing for being disabled. However, the claimant does not have a medical history of experiencing chronic asthma attacks every 2 month[s] or at least 6 time[s] a year. Moreover, they found the claimant to have extreme limitation in activities of daily living. This is inconsistent with the claimant's testimony in which she admitted to completing some chores, taking care of her young child and being independent in personal care. Finally, they found the claimant to be disabled due to mental impairments. This finding is inconsistent

with the claimant not receiving any formal mental health treatment.  Thus, the
opinions of Dr. Zinni and Dr. DeMarco are given little weight because they are
not supported by the evidence and are not consistent with the record as a whole
(See SSR 96-6p).

(AR 19-20).

Plaintiff argues that the ALJ's reasons for rejecting her treating physicians' opinions were
conclusory and inadequate, and that "it remain[ed] unclear what inconsistencies the ALJ saw in
the evidence."  *See* [ECF No. 18] p. 17.  We disagree.  Although Plaintiff points primarily to this
one paragraph of the ALJ's decision, she fails to acknowledge the ALJ's analysis of the other
evidence undertaken in the case.

In this regard, the ALJ observed that Plaintiff was treated conservatively with physical
therapy and medications by Dr. Bernstein for her complaints of fibromyalgia in January 2007
(AR 16; 301).  The ALJ further observed that in July 2007, Plaintiff complained that her
fibromyalgia had flared up, but her physical examination was normal and Dr. DeMarco
prescribed no treatment (AR 16; 303).  In November 2007, Plaintiff complained of asthma and
fibromyalgia, and Dr. Hilbert reported that her physical examination was normal (AR 16; 381).
At a follow up visit that same month her lungs were clear, and pulmonary function testing in
December 2007 revealed normal lung volumes (AR 16; 376; 382).

The ALJ found that Plaintiff was treated conservatively by Dr. Hilbert throughout 2008,
and at her last visit in July 2008, her physical examination was again primarily normal with
minimal positive straight leg raising on the left (AR 16; 360-362; 358-359).  Dr. Osial found
"only diffuse tender points" on physical examination in July 2008, and recommended Plaintiff
restart her medications at the conclusion of her pregnancy (AR 16; 357).

The ALJ also reviewed Dr. Swantek's consultative examination results, as well as his
treatment note entries (AR 16).  The ALJ noted that Plaintiff complained of multiple problems
including severe asthma and fibromyalgia, but her physical examination revealed fairly good
range of motion (AR 16; 336).  When seen by Dr. Swantek in March 2008, Plaintiff's physical
examination was primarily normal and he reported she was breathing fairly well (AR 17; 683).
Dr. Swantek did not diagnose Plaintiff with fibromyalgia, and at her office visit in April 2008, he

found her asthma was not severe (AR 17; 682).  As the ALJ observed, Plaintiff had actually decreased her asthma medications because her symptoms had improved (AR 17; 682).

The ALJ examined Dr. Zinni's records, observing that on October 28, 2008, Plaintiff's lungs were clear, and on December 10, 2008, her lungs were normal on examination (AR 17; 420).  On July 7, 2009, Plaintiff's physical examination was normal and her lungs were clear with equal breath sounds (AR 18; 610).  In August 2009, Dr. Zinni found possible early obstructive pulmonary impairment, but found Plaintiff would benefit from broncodilator therapy (AR 18; 688).

The ALJ reviewed and summarized Dr. Rowaine's and Dr. Singh's records, noting the normal findings on physical examination with respect to Plaintiff's asthma symptoms and musculoskeletal complaints (AR 17; 352-353; 423-427).  The ALJ recounted Dr. Rothenberg's findings on physical examination on April 8, 2009, that Plaintiff's joints were normal and "no fibromyalgia tender points [were] identified" (AR 17; 432).  The ALJ also reviewed Dr. Magoline's consultative examination, observing that Plaintiff exhibited no tenderness on examination but complained of pain with palpation (AR 18; 735-736).

The ALJ also considered Plaintiff's daily activities, concluding that Plaintiff's ability to perform some household chores, care for her two-year-old daughter and her own personal needs, were inconsistent with a disabling level of functioning (AR 18).  The ALJ found it significant that Plaintiff continued to work after her alleged onset date, which, in the ALJ's view, demonstrated an ability to perform work-related activities (AR 19).

In addition to the above evidence, the ALJ found Dr. Zinni and Dr. DeMarco's opinions with respect to her physical impairments were contrary to the other medical opinions in the record (AR 20-21).  Consultative examiner and treating physician Dr. Swantek concluded that Plaintiff could lift and carry two to three pounds frequently and ten pounds occasionally; stand and walk for four hours a day; sit for eight hours a day with a sit/stand option; occasionally engage in postural activities; and should avoid exposure to vibrations, extreme temperatures, wetness, humidity, fumes, odors, chemicals and poor ventilation (AR 335-336).  The ALJ found Dr. Swantek's opinion, "unlike the opinions of Dr. Zinni and Dr. DeMarco," was consistent with

Plaintiff's objective testing and generally normal physical examinations (AR 20).  She accorded Dr. Swantek's opinion "great weight" because it was supported by the evidence, consistent with the record as a whole, and was rendered by an examining source (AR 20).

The ALJ also accorded "great weight" to the opinion of Dr. Magoline, another consultative examiner, who concluded that Plaintiff could lift up to ten pounds frequently and twenty pounds occasionally; carry up to twenty pounds occasionally; sit five hours; stand two hours; walk one hour in an 8-hour workday; and did not require the use of a cane to walk (AR 729-730).  He further found that Plaintiff could occasionally perform manipulative activities with her hands; operate foot controls; and climb ramps and stairs, but never balance, stoop, kneel, crouch or crawl, or be exposed to environmental irritants, except she could operate a car and be around moderate vibrations (AR 731-733).  The ALJ similarly found Dr. Magoline's opinion was supported by the evidence, consistent with the record as a whole, and was rendered by an examining source (AR 20).

Finally, the ALJ relied on the opinion of Dr. Tran, the state agency reviewing physician, who determined Plaintiff could perform sedentary work, but could only occasionally climb, balance, stoop, kneel, crouch and crawl, and avoid exposure to extreme temperatures, wetness, humidity, fumes, odors, gases and poor ventilation (AR 286-288).

In sum, the ALJ conducted a thorough analysis of the medical evidence relative to Plaintiff's alleged physical impairments in concluding that Dr. Zinni and Dr. DeMarco's opinions in that regard were not entitled to controlling weight (AR 19).  In making this determination, the ALJ provided sufficient and well-reasoned grounds, consistent with *Cotter* and its progeny, and her conclusions are supported by substantial evidence.

## V.    CONCLUSION

For the reasons discussed above, both motions will be denied and the matter will be remanded to the Commissioner for further proceedings.[5]  An appropriate Order follows.

---

[5] The ALJ is directed to reopen the record and allow the parties to be heard via submissions or otherwise as to the issue addressed in this Memorandum Opinion.  *See Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 800-01 (3rd Cir. 2010).

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JULIETTA MOLNAR,                          )
                                          )
                    Plaintiff,            )          Civil Action No. 11-127 Erie
                                          )
        v.                                )
                                          )
MICHAEL J. ASTRUE,                        )
Commissioner of Social Security,          )
                                          )
                    Defendant.            )

## ORDER

AND NOW, this 24th day of September, 2012, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [ECF. No. 17] is DENIED, and the Defendant's Motion for Summary Judgment [ECF No. 20] is DENIED.  The case is hereby REMANDED to the Commissioner of Social Security for further proceedings consistent with the accompanying Memorandum Opinion.

The clerk is directed to mark the case closed.

s/ Sean J. McLaughlin
United States District Judge

cm:    All parties of record